INVENGINEERING, INC., Plaintiff,

v.

FOREGGER COMPANY, Inc., and Mrs. Lilly M. Foregger, Defendants.

Civ. A. No. 465–59.

United States District Court
D. New Jersey.

June 14, 1960.

Pitney, Hardin & Ward, by Frank C. O'Brien, Newark N. J. (Merriam, Smith & Marshall, Chicago, Ill., by Charles J. Merriam, Chicago, Ill., of counsel), for plaintiff.

Stryker, Tams & Horner, Newark, N. J. (William J. Graham, New York City, of counsel), for defendants.

WORTENDYKE, District Judge.

Plaintiff is a corporation of the State of New Jersey. Defendant, The Foregger Company, Inc. (Foregger), is a New York corporation, and the individual defendant, Mrs. Foregger, is a resident of the latter State. The Court's jurisdiction derives from the fact of diversity of citizenship between the parties and the involvement of the minimum jurisdictional amount. This action was initially instituted in the United States District Court for the Northern District of Illinois, Eastern Division, but by order of that Court, entered upon the stipulation of the parties, it was transferred to this Court. For convenience in reference, plaintiff will hereafter be referred to as Invengineering, the corporate defendant as Foregger and the individual defendant as Mrs. Foregger.

At all times here relevant, one Arnold S. J. Lee was the secretary-treasurer, chief engineer, and general manager of the plaintiff corporation, with general authority to speak and act for it. He had developed three certain devices favorably received in the field of anesthesiology, consisting of a respirator named "Frumin Model 165" and two valves for use in attachment with the respirator, called respectively "Non-Rebreathing Valve Model 161" and "Pressure Equalizing Valve Model 185". The respirator had been sponsored by Dr. Frumin and the valves by Dr. Steen of the Columbia-Presbyterian Hospital in New York City, and they had used, tested and favorably commented upon the devices during the course of their development by Lee.

The Foregger Company was engaged in the manufacture and sale of devices in the surgical and anesthesiological fields.

Under date of December 26, 1958, a written agreement was entered into between the two corporate parties to this suit. It was executed in behalf of the plaintiff by Lee, as its general manager, and in behalf of the Foregger Company by Lilly M. Foregger, its vice-president. It was stipulated at the commencement of the trial that Mrs. Foregger was duly authorized to execute the agreement in

behalf of her company, and that Exhibit A, annexed to the complaint in this action, is a true copy of the instrument. At the time of the execution of the contract, the officers of the Foregger company were Dr. Richard Foregger, president, Mrs. Lilly M. Foregger and L. W. Bullard, vice-presidents, Robert C. Sarosy, treasurer, and James St. Leger, secretary. The board of directors of the company included all of the foregoing officers except St. Leger, and in addition also included Frederick Caparrelli, its plant manager.

By the terms of the contract in suit, following a recital therein that Invengineering, as licensor, had developed the devices above mentioned, and that Foregger was desirous of obtaining exclusive rights thereto, Invengineering grants to Foregger an exclusive license to make and sell these devices, and to use in the manufacture and sale thereof "any inventions of licensor involved therein." The license referred to is to continue for the "life" of the agreement "or of any patent which may issue on such inventions, whichever shall first occur." Foregger agrees to pay to the licensor (1) $30,000 on the execution of the agreement, (2) a royalty of $2 on each licensed valve, and (3) a royalty of $37.50 on each licensed respirator. Foregger also agrees to pay a minimum royalty of $1,000 quarterly on the licensed valves, and $2,000 quarterly on the licensed respirator; the latter minimum royalty (on the respirator only) to apply to the quarter commencing July 1, 1959 and thereafter. It is, however, further expressly provided in the agreement that "royalties shall be due upon sale of the licensed articles or upon removal thereof from Foregger's plant, whichever shall first occur." Licensor undertakes, by the terms of the agreement, to supply, within 30 days after the date thereof, "know-how and technical information * * * as to the manufacture and use of the licensed articles," and to "prosecute patent applications covering the licensed inventions." Licensee is accorded the right to terminate the agreement by written notice to licensor at any time but such termination is not to affect the obligation (of licensee) to pay accrued royalties. Licensor is also given the right to terminate the agreement by written notice, effective thirty days after giving the same, in the event of any default by Foregger under the contract;[1] but it is provided that such termination shall not relieve Foregger of the obligation to pay accrued royalties up to the time of the termination. It may be noted in passing that this written agreement was drafted by counsel for Invengineering, and presented by Lee to Mrs. Foregger for execution upon the date of the contract.

The evidence disclosed that despite the contract requirement that Foregger pay to Invengineering $30,000 upon the execution of the instrument, this payment was not made, but upon Mrs. Foregger's pleas of inconvenience and hardship, Lee orally agreed that she might pay the $30,000 in successive monthly installments of $5,000 each, to be evidenced by interest-bearing promissory notes, and two of these installment payments were made. By reason of default in the payment of the balance of the $30,000 in the stated installments, and also of failure to give the required notes for such installments, Lee elected to terminate the written agreement in behalf of the plaintiff, and did so by letter dated March 4, 1959.[2] Under date of March 26, 1959, through its attorney, Foregger gave notice to the plaintiff, purporting to disaffirm and re-

1. "Licensor may terminate this agreement by thirty (30) days written notice in the event of any default by Foregger hereunder, which notice shall be effective at the end of the thirty days unless the default has been cured in the meantime."

2. The letter stated that pursuant to its terms, the contract was terminated effective 30 days from the date of the letter "on account of failure of Foregger to pay the $30,000 provided" for and because the installment "notes have not been given, and the payment which was due on the last day of February has not been made."

scind the agreement, and demanding return of the $10,000 already paid thereunder. It is conceded that simultaneously with or shortly following the sending of this notice of rescission certain drawings and devices, admittedly prepared, developed and constructed by the plaintiff, pursuant to the provisions of the contract, were returned to the plaintiff.

The complaint in this action, in the Court's opinion, is unnecessarily prolix, and thereby induced a correspondingly verbose answer. However, at the pretrial conference the issues between the parties were appropriately narrowed by way of statements of net contentions and stipulations of facts. Essentially it is the claim of the plaintiff that Foregger failed to pay the $20,000 balance of the $30,000 down payment agreed upon, and that defendant failed to pay the minimum royalties amounting to $1,000 for the first calendar quarter of 1959, and pro rated royalties for the first three days of the second quarter of that year (on the valves). Plaintiff also seeks compensation, upon the theory of quantum meruit, for services rendered in redesigning the respirator for quantity production purposes.

The defendants contend that they are not liable to the plaintiff for any balance of the $30,000 down-payment mentioned in the agreement, after the conceded payment and receipt of $10,000 on account thereof, because "the saving clause in the contract specifies royalties and the down-payment is not designated a royalty." Defendants further contend that the agreement sued upon is unenforceable (1) for lack of consideration, in that the plaintiff was without title to the "inventions purportedly licensed", and (2) by reason of alleged fraudulent misrepresentations by the plaintiff to the defendants, and relied upon by them, that plaintiff had the right to grant an exclusive license by reason of the actual pendency of patent applications covering the devices described in the agreement. Defendants also deny that plaintiff complied with all of its undertakings expressed in the agreement, particularly those relating to the furnishing of know-how and technical information. Finally the defendants charge the plaintiff with unclean hands by reason of alleged overreaching of Mrs. Foregger by Lee. By way of counterclaim, defendants seek judgment of rescission of the contract for fraud, and for the return to Foregger of the $10,000 concededly paid under the contract in suit.

The contract was executed by and in behalf of the respective parties at the New York office of Foregger. An already prepared draft thereof was presented by Mr. Lee to Mrs. Foregger. By her own testimony, Mrs. Foregger was aware, at least a month before the execution of the document, of the terms which Lee would impose, and she had received legal advice respecting those terms before the drafting of the document and its presentation to her for signing. Indeed, she admitted that she had urged Mr. Lee's attorney to hasten the finalizing of the terms of the agreement between the parties. She had been informed and understood that Invengineering required the $30,000 down-payment mentioned in the contract as a pro tanto reimbursement of the expenses which Lee had incurred in developing the devices which were the subject of the contract. Upon the signing of the instrument, Mrs. Foregger as executive vice-president of Foregger, fully understood and intended to perform the provisions of the contract. She testified, however, that she had no check or cash with her or available at the time the contract was signed (although the signing concededly took place at Foregger's New York office) but that she was informed by Mr. Lee that she could make the down payment when she was able. Shortly after the execution of the agreement (December 31, 1958) a payment of $5,000 was made on account of the required down-payment, and on February 3, 1959 a similar amount was paid on the same account. Both of these payments were accepted and are still retained by plaintiff. On the occasion of each of these installment payments, the defendants fully intended to perform the

agreement and raised no question respecting its interpretation or relating to the circumstances which induced the meeting of the minds therein expressed. Mrs. Foregger contended that the contract was breached by plaintiff's notice of its termination, but she admitted that at the time of such termination she still entertained no thought of failing to perform. Indeed, she testified that the subsequent notice of rescission was the act of the attorney for the defendant corporation, and not hers. It was apparently Lee's insistence that so-called judgment notes be given to evidence the installment payments still due on account of the $30,000 down payment which resulted in defendants' failure to perform the oral modification of the terms of the written contract relating to the down payment.

■■ As stated, the contract was executed in the State of New York, where Foregger maintained its place of business. By its terms it was to be performed by Foregger in New York and by Invengineering at its place of business in Belmar, New Jersey. The determination of the law applicable to the construction and effect of the contract is governed by the law of the forum. Here, as in the case of In re Magnus Harmonica Corp., 3 Cir., 1959, 262 F.2d 515, the place of contracting and the place of unilateral performance were in New York, and therefore, New Jersey would refer to the New York law. See cases cited by Judge Goodrich in Footnote 8 on page 518 of the cited case, and Specialties Development Corp. v. C-O-Two Fire Equipment Co., D.C.N.J.1953, 109 F.Supp. 732, affirmed 3 Cir., 1953, 207 F.2d 753.

One of the substantial issues in this case was posed by the defendants' contention that Foregger was induced to enter into the contract in suit in reliance upon false representations made by Lee, and in the instrument of agreement itself, that the devices upon which Foregger undertook to pay royalties were invented by Lee, who had applied for, if not actually secured, patents thereon which enabled him to exclusively license their manufacture and sale by Foregger. It

was conceded by the parties that no patent or patent application for any of the licensed devices had been issued or filed prior to the date of the contract. Alice Ellenbogen, an employee of Foregger, who signed the contract in suit as a witness, testified that she was present at a dinner meeting of Mrs. Foregger with Lee in November, 1958, and took notes of what was said by the negotiators on that occasion. According to her recollection of the conversation, the $30,000 downpayment required by Lee was to be in exchange for the grant of the right to manufacture the licensed devices, and would be used by Lee to reimburse the government grant by means of which he had developed the devices under the sponsorship of Columbia University. Miss Ellenbogen also testified that Lee promised to turn over patents to Foregger. The transcript of her notes of the discussion, however, contains no reference to patents or patent applications. Although Foregger's plant manager, Caparrelli, and its accountant, Bernstein, testified that Lee had stated, during negotiations preliminary to the execution of the contract, that patent applications relating to the devices were on file in the United States Patent Office, his written report upon the devices to his superiors is also silent respecting patents or patent applications thereon. Mrs. Foregger's testimony that Lee told her, during the negotiations, that he had taken out patents upon the devices is directly contradicted by Lee, and is inconsistent with the language of the written agreement and in conflict with other more persuasive evidence in the case. I accept Lee's testimony that he told Mrs. Foregger that patent applications were being prepared, and his letters of October 3 and 4, 1957 and of July 1, 1958, respectively, to his patent attorney, explicitly directed the latter to prepare and file patent applications.

■ With respect to the defendants' contention that the contract in suit was void for failure of consideration, in that the plaintiff was without title to the inventions purportedly licensed, and that

the plaintiff was without authority to grant the exclusive license contemplated by the language of the agreement, I find the defendants estopped to question the title of the plaintiff and its right to grant the license. See Ferry-Hallock Co. v. Progressive Paper Box Co., Chanc.1909, 76 N.J.Eq. 1, 73 A. 230, affirmed 76 N.J. Eq. 338, 75 A. 1100. Moreover, the evidence disclosed that no one other than the plaintiff has made any claim to any interest in the devices or in the inventions, if any, embodied therein, so far as is known to any of the parties to the contract referred to in the complaint. Dr. Frumin, whose name had been associated with the devices in trade and scientific articles dealing therewith, and who was repeatedly mentioned during the course of the testimony, has asserted, in his signed statement, admitted in evidence on the trial of this case, that to his best belief the devices were invented solely by Mr. Lee. Because of Lee's relationship with the plaintiff corporation, any inventions made by Lee which are involved in the devices belong entirely to the plaintiff. Lee has so acknowledged the plaintiff's right to such inventions and assigned them to the plaintiff. Defendants have failed to sustain their burden of proof that the plaintiff fraudulently induced Foregger's entry into the contract. It was only upon the issue raised by the charge of fraud in the inducement to the contract that evidence respecting negotiations between the parties prior to the date of the execution of the agreement became relevant and admissible. The evidence is uncontradicted that as early as October of 1957 Lee commenced proceedings looking to the filing of applications for patents covering both of the valves and the respirator. In his letter of October 3, 1957 to his patent attorney, Mr. Merriam, he requested a Patent Office search in connection with the pressure-equalizing valve, and, in his letter of October 4, 1957 to the same attorney, he made a similar request with respect to the non-rebreathing valve and directed the attorney to file a patent application. On July 1, 1958 Lee wrote Mr. Merrian requesting the filing

of an application for a patent on the respirator. At the time of the trial, applications for patents on each of the three devices were pending in the United States Patent Office. On August 1, 1958 an application was filed for a patent upon the non-rebreathing valve; on January 20, 1959, an application was filed for a patent upon the pressure-equalizing valve and respirator; and on April 6, 1959, an application was filed for a patent upon the pressure-equalizing valve alone. The recital in the contract is not that the plaintiff licensor had *previously* either applied for or obtained a patent upon any of the three devices therein referred to. That recital merely states that the licensor had developed the devices and that Foregger was desirous of obtaining exclusive rights thereto. As its initial undertaking, the licensor granted to Foregger exclusive license to make and sell the devices and to use in the manufacture and sale thereof "any inventions of licensor involved therein." The following sentence in paragraph 1 of the contract provides that the license granted was to continue for the life of the agreement or "of any patent which *may issue* on such inventions" (emphasis supplied), whichever first occurred. The meeting of Lee and Mrs. Foregger at which the contract was executed was only a final step in a series of negotiations which commenced in September or October of 1958, when Mrs. Foregger and one of her directors visited plaintiff's plant at Belmar, New Jersey, and were in turn visited at the Foregger plant by Lee and his wife. The respirator was demonstrated and the licensing of its manufacture and sale was discussed. During these preliminary negotiations Lee informed Foregger that patent applications were being prepared for the devices, and stated that, in his opinion, they were patentable. With the authorization of Foregger's board of directors one Harry Wilson, then Foregger's attorney, offered Lee a contract providing for down payments of $5,000 and $3,000 for both valves and the respirator respectively, and $2.00 per valve and $37.50 per respirator as royalties. These

terms were emphatically rejected by Lee. As a result of Mrs. Foregger's persistence, however, the negotiations were resumed after the rejection of Wilson's suggested terms, and, in the course of the subsequent discussions, Lee insisted upon a down-payment of $30,000 in view of Foregger's insistence that the contemplated license be exclusive. I find that the amount of this down-payment, which was ultimately agreed to between the parties, was treated by them as reflecting Lee's relinquishment of his right to manufacture or to license others to manufacture the devices in question, and to constitute a return to him of part of his investment in bringing the devices to the stage of development which they had then reached.

█ Having charged fraud, the defendants, of course, assumed the burden of proving its existence as an inducement to the making of the contract. City of Clifton v. Cresthaven Cemetery Association, App.Div.1950, 6 N.J.Super. 391, 71 A.2d 655. Defendants have not discharged that burden in this case. I find in the evidence no basis for a conclusion that Foregger was induced to enter into the contract in suit by any intentional misrepresentation of a material fact chargeable to the plaintiff and relied on by the defendants to their damage. See Southern Development Co. of Nevada v. Silva, 1888, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678. I further find that the notice of termination of the contract given by the plaintiff to the defendant was strictly in accordance with the provisions of the instrument and justified by a clear breach, on the part of Foregger, of its obligations thereunder, as modified orally with respect to the time and manner of making the down-payment called for thereby. I conclude, therefore, that Foregger's purported rescission of the already duly terminated agreement was a futile and ineffective act by one party whose previous default had already justified the prior termination of the contract by the other party. In consideration of the plaintiff's willingness to accept the payment of $30,000 in installments, rather than in one lump sum, Mrs. Foregger agreed, for her company, to make successive monthly payments of $5,000 each. The defendant defaulted in this undertaking, thereby entitling the plaintiff to terminate the contract between the parties. Plaintiff's termination of the contractual relationship was therefore justified.

█ The situation confronting Invengineering when Foregger defaulted in its payment of the remaining installments of the principal consideration for the license to manufacture and sell, was generally similar to that confronting the inventor in Oscar Barnett Foundry Co. v. Crowe, 3 Cir., 1915, 219 F. 450, who had licensed the foundry company to make and sell, at a fixed royalty, certain stokers invented by Crowe. Upon learning of the breach by the foundry company of its undertaking to make and sell the stokers under the contract, Crowe notified the foundry company that he considered the contract rescinded and sought an adjudication accordingly, together with an injunction against the foundry's assertion of any right under the contract to make and sell the stokers. The District Court entered judgment in accordance with the prayers of the complaint, but denied the right of either party to an accounting or damages by or against the other. In affirming the decree of the District Court, after modification thereof in a respect not here of interest, the Court of Appeals found that, in failing in its undertaking to manufacture and sell the stokers, the foundry company committed a breach of its covenant with Crowe, which went to the very essence of the contract, and authorized Crowe to rescind the agreement. The Court (at page 455) held that when a breach of contract permitting rescission occurs, the offended party "may consider the contract rescinded and himself exonerated, or sue upon the contract for such damages as he has thereby sustained." In the present case Foregger's failure to complete the down-payment amounted to a breach of that part of its obligation which went to the whole consideration

and therefore entitled Invengineering to consider the contract rescinded and itself exonerated, or to sue upon the contract for its damages. Although plaintiff purported to act under paragraph 11 of the contract authorizing *termination* of the agreement by the licensor by thirty days' written notice in the event of any default by the licensee, the effect of plaintiff's written notice of termination, when construed with regard to the language of the entire contract and considered in the light of the circumstances of the parties at the time the so-called termination became effective, was in essence the same as a notice of an election to rescind the agreement.

 In its complaint in this action plaintiff seeks essentially equitable relief. As stated in the pretrial order, the plaintiff prays (1) for a declaration that the contract between the parties was terminated on March 4, 1959; (2) for recovery of the unpaid balance of the downpayment prescribed by the terms of the contract; (3) for the reasonable value of plaintiff's services in redesigning the respirator for commercial production; and (4) for an injunction and restoration to place the plaintiff in status quo ante; the plaintiff expressly disclaiming any desire for the enforcement of the contract or for damages arising thereunder. Rule 16, F.R.Civ.P., 28 U.S.C., provides that the order entered upon the pretrial conference "controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice." No modification of the pretrial order in this case was sought or made. Having invoked the equitable jurisdiction of this Court, the plaintiff must itself do equity. Because I have concluded that plaintiff's so-called termination of the contract amounted to a rescission thereof on its part, plaintiff thereby assumed the obligation to restore Foregger to the status which it occupied before the contract was entered into. I have already determined that the subsequent attempted rescission of the agreement by Foregger was but an idle gesture, following, as it did, the justified rescission of the contract by the plaintiff. At best, Foregger's purported rescission is a concurrence in plaintiff's assertion that the contractual obligations of the parties were at an end. I find from the evidence that plaintiff partially performed the agreement by rendering valuable services to Foregger in contemplation of the continuance of the contract and in aid of Foregger's ability to perform its obligations thereunder.

 The plaintiff's performance obligations under the contract included that "to supply within thirty (30) days hereafter know-how and technical information to a designated representative of Foregger as to the manufacture and use of the licensed articles." Lee testified that this undertaking on his part was duly performed. However, it was found that special designing was required in order to achieve all possible economies in Foregger's production of the devices in question. Foregger's plant manager, Caparrelli, and Mrs. Foregger represented to Lee that Foregger had no production engineer or person trained to engineer production, and thereby lacked the means of producing the devices in quantity. Lee thereafter offered to devise and design production processes and equipment for Foregger. His offer was accepted and the drawings and advice involved were furnished by him. In order to accomplish these extra services it was necessary for Lee to hire an additional mechanical engineer, with whom, together with his own engineer and himself, some ten weeks were devoted to that accomplishment. Lee himself devoted one-half of his total working time to that effort during that period. Qualifying as an experienced production engineer, Lee testified that the reasonable value of the services so rendered to Foregger by him and his associates was $10,000. Although he contended that this redesigning of plant equipment was not contemplated when the contract in suit was signed, Lee said that in further consideration of the contractual undertakings of the defendant, he offered to furnish these services without additional charge. Plaintiff predicates its right to recover

the reasonable value of these services upon the theory that they were voluntarily accepted by Foregger, which impliedly promised to pay a reasonable sum for them, as was the case in Steffler v. Schroeder, App.Div.1951, 12 N.J.Super. 243, 79 A.2d 485. The defendants produced no evidence tending to refute plaintiff's proofs respecting the services which Lee performed in assisting Foregger to provide the necessary production facilities to avail itself of the benefits of the contract. I must, therefore, accept Lee's testimony upon this phase of the case, and his opinion as to the reasonable value of such services. While the drawings which were prepared by Lee and his engineering assistants for Foregger for the latter's production lay-out were returned by Foregger to Lee at the time of the attempted rescission of the contract, there is no evidence that these documents were suitable either for use by the plaintiff, or by any other manufacturer except Foregger, for which they had been specially prepared. If, as it did, Foregger elected to rescind the contract (albeit ineffectively), it was obligated to restore the plaintiff to its status quo ante, and such restoration in respect to the engineering services which plaintiff had performed could be effected only by payment of the reasonable value of such services. Therefore any obligation which would otherwise exist on the part of the plaintiff to restore to Foregger the two $5,000 installments paid by the latter on account of its down-payment obligation under the contract is offset by Foregger's indebtedness to the plaintiff upon the theory of quantum meruit for plaintiff's services. I conclude, therefore, that plaintiff is entitled to retain the money which it has received on account of the down-payment. It should be remembered that during the services which Invengineering rendered to Foregger pursuant to and beyond the requirements of the contract, prior to its termination or rescission by the plaintiff, Foregger had not changed its position under nor taken any steps pursuant to the obligations imposed upon it by the contract, excepting the payment of the two

installments above mentioned. Part of the relief which Invengineering seeks in this equitable action is an adjudication that Foregger be deprived of all rights in and from using and dealing with the devices described in the agreement, and for a mandatory return by Foregger to the plaintiff of the devices themselves, and of all the production drawings prepared in contemplation of their manufacture by Foregger. To this relief I find the plaintiff to be entitled. However, plaintiff may not secure a return of the devices and production drawings, enjoin the defendants from using and dealing with the licensed devices, recover the reasonable value of services which the plaintiff rendered to Foregger, and at the same time, by way of recognition of the persistence of the contract which it had previously undertaken to terminate or rescind, recover the balance of the down-payment called for by the terms of that agreement. "As a general rule, a remedy based on the theory of the affirmance of a contract * * * is inconsistent with a remedy arising out of the same facts and based on the theory of its disaffirmance or rescission * * *." Paoli v. Zipout, Inc., 1959, 21 Ill.App.2d 53, 157 N.E.2d 79, 82. See also Ferry-Hallock Co. Progressive Paper Box Co., supra, at page 231 of 73 A. Irrespective of Lee's motive in requiring a down-payment of $30,000 under the contract, whether in contemplation of reimbursement for his services and expenses in developing the devices or otherwise, his election to terminate the agreement and resulting obligation to make restitution is incongruous and inconsistent with any right or claim to receive payment of the balance of the $30,000 besides the reasonable value of the services which he rendered to Foregger covered by the contract provisions. The situation would be different respecting the right to the balance of the down-payment if the effect of the agreement was equivalent to a sale of the devices and production drawings by Invengineering to Foregger. I do not find that such was the intention of the parties nor that title to the devices or pro-

duction drawings passed from Invengineering to Foregger. Since plaintiff has received a return from Foregger of the devices and production drawings, plaintiff is at liberty to relicense the manufacture and sale of the devices to another.

 As previously noted, the contract provided that "royalty shall be due upon the sale of the licensed articles." Foregger, however, by the terms of the agreement, undertook to pay a minimum royalty of $1,000 per calendar quarter on the licensed valves and $2,000 per calendar quarter on the licensed respirator. The quarter relating to the minimum royalty on the latter device was not to commence until July 1, 1959. It seems clear, therefore, that the plaintiff is not entitled to any royalty on the respirator. It claims, however, $1,000 as minimum royalty on the valves for the quarter ended March 31, 1959 and pro rata for the three days of the succeeding quarter, which preceded the termination of the contract. A royalty normally, by the terms of the contract, becomes due only upon the sale of the licensed article. I believe that paragraphs 3 and 4 of the contract prescribing minimum royalties must be read together with paragraph 5. In so doing, I construe the agreement to require the payment of no royalty unless there has been a sale of at least one unit of the article to which it applies. This interpretation seems to be further supported by the provisions of paragraphs 6 and 7, which require the application by Foregger of consecutive serial numbers on each respirator and the making of quarterly reports of sales, accompanied by payment of the royalties due thereon. I therefore reject plaintiff's royalty claims in this action.

 Reverting to the prayers for relief set forth in the complaint, I conclude and determine that the contract in suit was lawfully rescinded by plaintiff as of April 3, 1959. Plaintiff is entitled to judgment for the sum of $10,000, payment whereof it has received, and Foregger, together with its officers, employees, agents and those in privity with them, will be enjoined from using any confidential information concerning the devices licensed under the contract which were obtained from the plaintiff or from Lee. If my understanding is correct that all drawings, photographs, sketches and descriptive matter, and any copies thereof, as well as the devices themselves, have been returned to the plaintiff, the judgment herein need not direct their return. Otherwise such return will be ordered. Defendants will be further enjoined from using the doctors' list of the Anesthesiological Society, and of any other actual or prospective purchasers of the devices which were furnished by the plaintiff to the defendants, and from asserting any right to manufacture or sell such devices.

The foregoing shall constitute my findings of fact and conclusions of law and an order in conformity with said conclusions may be presented for signature.